J-S47035-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ADAM WAYNE BELTZ, | : | |
| | : | |
| Appellant | : | No.  2101 MDA 2014 |

Appeal from the Judgment of Sentence Entered June 16, 2014,
in the Court of Common Pleas of Berks County,
Criminal Division, at No(s): CP-06-CR-0003661-2013

BEFORE:    ALLEN, OTT, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED AUGUST 07, 2015**

Adam Wayne Beltz (Appellant) appeals from a judgment of sentence entered after the trial court convicted him of violating 75 Pa.C.S. § 3802(d)(2).  We affirm.

The background underlying this matter can be summarized as follows. Appellant was arrested after he crashed a vehicle over an embankment and into a creek.  At a nonjury trial, Appellant faced charges of violating several driving-under-the-influence (DUI) statutes, specifically:   75 Pa.C.S. §§ 3802(d)(1), 3802(d)(2), and 1543(b)(1.1)(i).   After hearing the Commonwealth's evidence, the trial court granted Appellant's motion for judgment of acquittal regarding subsections 3802(d)(1) and 1543(b)(1.1)(i). The court, however, convicted Appellant of violating subsection 3802(d)(2). That subsection provides as follows:

*Retired Senior Judge assigned to the Superior Court.

**(d) Controlled substances.--**An individual may not drive, operate or be in actual physical control of the movement of a vehicle [when t]he individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. § 3802(d)(2).

After the trial court sentenced Appellant, he timely filed a post-sentence motion. That motion was denied by operation of law on November 10, 2014. Appellant timely filed a notice of appeal. The trial court directed Appellant to comply with Pa.R.A.P. 1925(b), and Appellant filed a 1925(b) statement. The court later filed an opinion consistent with Pa.R.A.P. 1925(a).

In his brief to this Court, Appellant asks us to consider one question, namely:

> Was not the evidence insufficient to support the verdict where the trial court granted the motion for judgment of acquittal as to the specific count involving the presence of cocaine metabolites, and convicted him of the driving under the influence of a controlled substance to such a degree that his driving was impaired?

Appellant's Brief at 4 (unnecessary capitalization omitted).

Appellant challenges the sufficiency of the evidence presented by the Commonwealth at his trial. More specifically, Appellant contends that, because the Commonwealth's expert testified that Appellant's blood tested positive for an inactive cocaine metabolite but not cocaine, the

- 2 -

Commonwealth failed to prove that Appellant drove while under the influence of a controlled substance. We disagree.

We review challenges to the sufficiency of the evidence as follows.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Graham*, 81 A.3d 137, 142 (Pa. Super. 2013) (citation omitted). We further observe that, in *Commonwealth v. Griffith*, 32 A.3d 1231, 1239 (Pa. 2011), "our Supreme Court held[ that] the focus of [subsection] 3802(d)(2) is not upon the type of evidence introduced, but upon whether **the totality of the evidence** proved that the defendant's inability to drive safely was the result of the influence of a drug or combination of drugs." *Graham*, 81 A.3d at 145 (citation, footnote, and quotation marks omitted) (emphasis in original).

In relevant part, the Commonwealth presented the evidence that follows at Appellant's bench trial. The Commonwealth's first witness was Mark Ruch. On the morning of June 21, 2013, Mr. Ruch drank a cup of coffee while sitting at the front of his apartment building. He finished his coffee and began to walk back to his apartment around 7:00 a.m., when he "heard somebody laying on a car horn for about maybe 20 seconds or 30 seconds." N.T., 4/11/2014, at 5. He heard a loud crash and "then, when [he] got towards the end of [his] alley, [he] saw a car going backwards down Peach Street towards the creek." *Id.* The car was billowing steam and smoke out of its front end. Mr. Ruch subsequently "heard a splash and a thunk." *Id.* at 6.

Mr. Ruch approached the vehicle, which was sitting with its rear bumper in a creek and its front bumper lying on the bank of the creek. Mr. Ruch assisted Appellant to safety.[1] Appellant indicated to Mr. Ruch that he did not know what had happened to him. Someone called emergency services, and a police officer arrived soon thereafter.

The Commonwealth next called to the stand Officer Kevin Mickle. Officer Mickle had been employed by the Hamburg Borough Police Department since 2013. He had been employed as a law enforcement

---

[1] Mr. Ruch could not identify Appellant at trial. However, there is no dispute that Appellant was the person Mr. Ruch encountered on this day.

officer since 2010. Officer Mickle was the first officer to respond to the scene of the accident.

According to Officer Mickle, Appellant stated that he could not remember anything. Officer Mickle performed a breathalyzer test on Appellant, which "read all zeros." *Id.* at 15. Eventually, state troopers arrived on the scene and stood by as Officer Mickle conducted field sobriety tests with Appellant.[2]

The officer conducted three field sobriety tests on Appellant: the walk-and-turn test, the one-leg-stand test, and the horizontal-gaze-nystagmus test.[3] As to the walk-and-turn test, Officer Mickle testified, "[At] the instruction stage [Appellant] started too soon and couldn't keep his balance. During the testing stage of that, he took too many steps in the first nine steps and too many steps on the second nine steps and did an improper turn." *Id.* at 17. Appellant also failed the one-leg-stand test. The officer's testimony suggests that Appellant passed the horizontal-gaze-nystagmus test. However, while Officer Minkle was administering that test on Appellant, the officer observed Appellant "closing his eyes, his eyes were barely open, and he was swaying side to side to the point where [the officer] thought [Appellant] may fall over during the test." *Id.*

---

[2] Hamburg emergency medical services also arrived on the scene. Appellant refused any medical treatment.

[3] On cross examination, Officer Mickle testified that, in 2009 or 2010, he received standard training for drug and alcohol related field sobriety testing.

In terms of how the vehicle Appellant was driving ended up where it did, Officer Mickle's investigation revealed that Appellant was traveling eastbound on Pine Street and turned northbound, when he struck a cement barrier. The officer testified as follows.

> The vehicle must have went in reverse or slid across the concrete barrier and continued northbound on Primrose Street. And then there's other photos that depict that the vehicle either sideswiped or struck other buildings or cement barriers in the area before either going in reverse or just drifting backwards until it went down the embankment.

*Id.* at 20.

After the field sobriety tests, Officer Mickle arrested Appellant for suspicion of DUI. The officer escorted Appellant to St. Joe's Medical Center, and Appellant consented to a blood draw at approximately 8:30 a.m. A phlebotomist then drew a blood sample from Appellant. Officer Mickle opined that, based upon his experience, Appellant's performance on the field sobriety tests demonstrated that Appellant was not capable of safely driving a vehicle on the morning in question.

The Commonwealth's final witness was Ayako Chan-Hosokawa. Ms. Chan-Hosokawa is the forensic toxicologist who tested Appellant's blood sample. Ms. Chan-Hosokawa did not find cocaine in Appellant's system; however, she did find 500 nanograms per milliliter of benzoylecgonine in Appellant's blood. According to Ms. Chan-Hosokawa, "[b]enzoylecgonine is a pharmacologically inactive metabolite of cocaine -- break down of cocaine.

That's what the body does to get rid of some foreign substances to the body from the body." *Id.* at 52. Cocaine is a Schedule II controlled substance. 35 P.S. § 780-104(2)(i)(4).

In terms of how cocaine and benzoylecogonine affect a person, Ms. Chan-Hosokawa offered the following testimony.

> []So [benzoylecogonine] does not have any affect in human performance, however, it is the indicator that somebody did ingest cocaine. And the cocaine is a central nervous system stimulant, so as a stimulant, cocaine can affect people in two different way[s]. Initial way is restlessness, increase[d] talkativeness, a little bit self-absorbed, paranoid psychosis, disorientation, hallucination has been reported, delusion.
>
> The second phase is dysphoric phase. During that time somebody has finished a rush, and their rush phase, so they experience similar to central nervous system depressant-type work, so one can be very drowsy, they're agitated, and they experience some type of psychosis and they would be craving the drugs.

*Id.* at 54-55.

The prosecutor asked whether the process of cocaine disappearing from the body and the body being left with benzoylecogonine can cause a person to be drowsy or agitated or cause some sort of psychosis. Ms. Chan-Hosokama answered, "The cocaine does not. The benzoylecogonine itself does." *Id.* at 55. According to Ms. Chan-Hosokama, when cocaine wears off, a person can be relaxed or somewhat drowsy.

On cross-examination, Ms. Chan-Hosokama testified that benzoylecogonine itself has no impairing effect on a person. *Id.* at 57. She

further stated that the level of benzoylecogonine in Appellant's blood suggests generally that he consumed cocaine at least more than two hours before his blood was drawn.[4]

It is indisputable that Appellant drove a vehicle in an unsafe manner. For purposes of determining whether the Commonwealth proved that Appellant violated subsection 3802(d)(2), the only question is whether Appellant's inability to drive safely was the result of the influence of a drug. When the totality of the evidence presented at trial is viewed in a light most favorable to the Commonwealth, it sufficiently demonstrates that Appellant's inability to drive safely was the result of the influence of cocaine.

More specifically, Ms. Chan-Hosokama's expert testimony establishes that, at least two hours before his blood was drawn at approximately 8:30 a.m on June 21, 2013, Appellant consumed cocaine. Appellant's accident occurred around 7:00 a.m. that day. Moreover, Appellant's overall behavior immediately after the accident, his inability to pass the battery of field sobriety tests, and his drowsiness during those tests sufficiently established that he was driving during the dysphoric phase of cocaine use.

---

[4] On direct examination, Ms. Chan-Hosokama stated that the length of time benzoylecogonine stays in a person's system is dependent upon several factors. She explained that a chronic user may have the metabolite in his or her system of a few days, whereas an occasional user may have it in his or her system for a day or two. She further explained that the manner in which the a person consumes the drug, *i.e.*, smoking it versus snorting it, and whether the person binged on cocaine also affect how long the metabolite stays in a person's blood. N.T., 7/8/2014, at 55-56.

For these reasons, we conclude that the totality of the evidence presented by the Commonwealth at trial proved that Appellant's inability to drive safely was the result of the influence of cocaine. ***See***, ***e.g.***, ***Commonwealth v. Hutchins***, 42 A.3d 302, 309 (Pa. Super. 2012) (holding evidence sufficient to establish that a controlled substance rendered Hutchins' driving unsafe although blood tests revealed a marijuana metabolite but no active marijuana where police observed signs of marijuana use immediately following the collision)  Accordingly, the evidence was sufficient to demonstrate that Appellant violated subsection 3802(d)(2). We, therefore, affirm Appellant judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 8/7/2015